T.C. Memo. 2000-346


UNITED STATES TAX COURT


EVELYN M. MARTIN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26555-96.                    Filed November 8, 2000.


<u>Stephen G. Salley</u> and <u>Anthony J. Scaletta</u>, for petitioner.

<u>Willie Fortenberry, Jr.</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in and additions to petitioner's Federal income tax for the 1986 and 1987 taxable years as follows:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653 (a)(1)(A) | Sec. 6653(a)(1)(B) |
| 1986 | $2,707,872 | $269,713 | $135,394 | [1] |
| 1987 | 1,725,692 | 426,884 | 86,285 | [1] |

[1] 50 percent of the interest due on the deficiency.

All section references are to the Internal Revenue Code in effect for the years under consideration, and all Rule references are to the Tax Court's Rules of Practice and Procedure, unless otherwise indicated.

The sole issue for consideration is whether petitioner should be relieved of liability for any portion of the income tax and additions to tax under the provisions of section 6015. Entitlement to relief is, in part, dependent upon a taxpayer's knowledge about the questioned item(s) at the time of signing a joint return.

## FINDINGS OF FACT

Petitioner and her husband, Glen H. Martin, filed delinquent joint Federal income tax returns on December 31, 1987, and April 4, 1989, for their 1986 and 1987 tax years, respectively. At the time of the filing of her petition, petitioner's legal residence was Dallas, Texas. Petitioner's husband has been incarcerated in a Federal penitentiary since 1995.

Petitioner was born in 1935 in Canada and was one of six children. She discontinued her education at age 14 and entered into a training program with the Royal Bank of Canada. She

worked at the bank for approximately 7 years, advancing from a mail clerk position to that of a teller and thereafter became an administrative office manager of a general insurance agency. In 1961, the insurance agency transferred her to Miami, Florida, where she met her first husband, married, and had a daughter in 1964. Shortly thereafter, petitioner divorced her first husband and returned to the Royal Bank of Canada for a short time. Following that, she returned to Florida and began to work for Amicable Life Insurance Co. (Amicable). Petitioner met Mr. Martin, a part-time insurance salesman at Amicable, and they were married in 1968, and petitioner became a full-time housewife with two additional children born during 1969 and 1973.

Mr. Martin established a very successful insurance agency, named "Insurance Agency of America" (IAA), which wrote policies exclusively for Amicable. Generally, petitioner's involvement with IAA was in the role of supporting Mr. Martin's career as his spouse, entertaining business associates, and accompanying Mr. Martin on agent recruiting trips.

In September 1981, Mr. Martin formed a Florida corporation named "Glenn H. Martin and Associates, Inc. d/b/a IAA" and named himself board chairman, president, and treasurer. Petitioner was named vice president and secretary of the corporation. Petitioner was not involved in the business of IAA, and her designation as an officer of the corporation was in the nature of

a nominee.  IAA was, in effect, a holding company, with 80.2 percent of the shares in another corporation, Financial Security Corp. of America, Inc. (FSCA).  Through the end of 1986, Mr. Martin held 80 percent of the shares of IAA, and the remaining three shareholders were some of the same people who owned the 19.8 percent of the shares of FSCA that were not held by IAA.  In turn, FSCA was the parent of eight subsidiary corporations, including one named Primera Development Corp., Inc. (Primera).

Mr. Martin had been a high school teacher and coach, earning extra income by means of part-time insurance sales.  By employing teacher/coaches, he was very successful in his insurance agency business and, as of 1984, had 2,500 agents under contract.  In 1984, Amicable was purchased by another insurance company, which detrimentally affected Mr. Martin and IAA, and, due to contractual disputes with their agents, a suit was filed against the purchaser of Amicable.  Mr. Martin began looking for another insurance company to underwrite his business, and, in 1984, he acquired Twentieth Century Life Insurance Co. (Life) and made it a subsidiary of a holding company named Twentieth Century Financial Corp., Inc. (Financial).  Financial was owned 51 percent by Mr. Martin, and he and petitioner were board members. Petitioner was a minority shareholder of Financial.  Petitioner was not involved in the business of Financial, but she did get involved in public relations, such as charitable projects in

connection with the corporation's public image. Petitioner was able to pick up a limited amount of business information from her participation on the boards of some of the related corporations, but she was generally not involved in or knowledgeable about the day-to-day operations or the details of the business of Financial.

Mr. Martin's success in the insurance business permitted the Martins, during 1975, to build a palatial home in the Sweetwater Estates subdivision. From 1975 through 1986, the success and the quality of the Martins' lifestyle continued unabated, including the purchase of Rolls Royce and Lamborghini automobiles, a 60-foot yacht, several other luxury automobiles, 2 airplanes, 5-carat and 12-carat diamond rings given to petitioner as gifts by Mr. Martin, and 4 Rolex watches. Although the Martins reported some net Federal income tax losses during the period 1981 through 1986, it was not uncommon for Mr. Martin to receive Forms W-2 for amounts in excess of $1 million. The Martins employed several household staff members and a full-time gardener. Petitioner was involved in high profile charitable and political fund raisers and threw lavish parties at the Martins' home. Although petitioner was a member of several of the corporate boards and was involved in the publication of Central Florida Magazine, during the period 1973 through 1987, she was primarily a housewife and mother.

Initially, petitioner maintained the Martin family's household finances, but after the business growth, Mr. Martin's personal business secretary began maintaining the Martin household and family finances. For example, petitioner maintained a checking account to pay routine bills for doctors, groceries, etc., but Mr. Martin's personal secretary paid, out of Mr. Martin's corporate shareholder accounts, a majority of household bills, such as those concerning the mortgage, credit cards, installment loan payments, etc.

In 1984, Mr. Martin hired Louis J. Hevey, a certified public accountant, and he became the chief financial officer for all of Mr. Martin's businesses. Mr. Hevey ensured that there was sufficient cash in the shareholder advance accounts to pay the Martins' expenses. Petitioner did not exercise any control or direction over Mr. Hevey, and she did not review his records or discuss finances with him. The amount of money used by Mr. Hevey to cover the Martins' lifestyle remained relatively constant during 1984-1991, the period Mr. Hevey worked for Mr. Martin.

During the period under consideration, Life advanced substantial funds to FSCA. In 1986, the North Carolina Insurance Department (NCID) regulators became concerned about the financial stability of Life and the large volume of loans to FSCA, which the regulators did not consider to be assets for statutory accounting purposes. Without considering the promissory notes

for funds due from FSCA, Life would have been "statutorily insolvent" and/or "impaired" under North Carolina law and thereby prohibited from underwriting life insurance.

FSCA was not capable of repayment, and so Mr. Martin and several advisers, including Mr. Hevey, designed a multistep transaction to bolster Life's assets. Although petitioner was generally aware of Mr. Martin's involvement in a transaction involving Primera and that the Primera land was involved, she did not discuss it with Mr. Martin and was not involved or consulted concerning the structuring or execution of the transaction. No cash or property inured to the benefit of or was received by the Martins due to execution of this transaction.

Mr. Forness, a certified public accountant who served Mr. Martin's business and prepared corporate and individual income tax returns, assisted in attempting to structure the transaction to make it appear that Federal tax consequences would be deferred under section 351. On December 15, 1986, Mr. Martin, Life, FSCA and its parent entered into a three-step transaction where the Primera stock would be contributed to Glen H. Martin and Associates, Inc. (GHMA), in exchange for 2,400 shares of GHMA stock. GHMA would then contribute the Primera stock to FSCA as paid-in capital. FSCA, in turn, would sell the Primera shares to Life in exchange for loan forgiveness and other consideration. Primera was valued at $22,540,000 as of November 26, 1986, and

its value was, in great part, attributable to real property. Petitioner did not participate in Mr. Martin's decision to enter into this complex transaction. At a January 30, 1987, shareholders' meeting for Financial and attended by petitioner, Mr. Martin in connection with the above-described transaction stated that, on December 31, 1986, the Primera property, consisting of approximately 196 acres of real estate, had been sold to Life for $115,000 per acre, or $22,500,000.

Mr. Forness prepared the 1986 and 1987 Federal income tax returns reflecting the above-described Primera transaction for all parties that were involved. A Form 4797, Sales of Business Property, attached to the Martins' 1986 joint Federal income tax return, reflected that the Primera transaction was subject to section 351, and therefore no gain was recognized. Petitioner now concedes that the Primera transaction should have resulted in gain and section 351 did not apply to cause nonrecognition. If petitioner and Mr. Martin had filed separate returns for 1986, petitioner would not have been required to report any portion of the gain from the Primera transaction.

In addition to the improper section 351 transaction, respondent made several other adjustments to arrive at petitioner's 1986 and 1987 income tax deficiencies, none of which would have been attributable to petitioner but for her filing a joint return with Mr. Martin. Extensions were obtained for

filing the 1986 and 1987 joint Federal income tax returns for petitioner and Mr. Martin, and the returns, ultimately, were not timely filed. Mr. Forness did not discuss any position taken on the Martins' income tax returns with petitioner, and she was not in a position to secure records from the various business entities to prepare the 1986 and 1987 joint returns. Petitioner did not receive any Forms W-2, Wage and Tax Statement, for the period under consideration. Mr. Forness always presented the joint Federal income tax returns to Mr. Martin, who in turn presented them to petitioner for her execution.

After the Primera transaction, NCID and the insurance regulatory authorities of two other States, focused on Life's financial situation and imposed restrictions. NCID, during 1987, ordered that Life sell Primera. During 1988, Life sold Primera to a development company for a $33 million promissory note linked to the real property. Mr. Martin did not discuss these difficulties with petitioner, and from 1984 through 1989, there was no change in her lifestyle, and petitioner believed that she was a wealthy person. Although petitioner was generally aware of the Primera transaction, it was not until a few years after the years in issue (sometime in 1990) that petitioner became aware of the tax and insurance-related details and financial problems with which her husband and family were confronted.

On March 1, 1991, NCID seized Life and declared it insolvent, relieving Mr. Martin of his position as president of Life. Thereafter, the Martins began selling off or losing their assets to foreclosure in order to pay day-to-day living expenses. By September 1991, most of the Martins' assets had either been repossessed or sold to pay their daily living expenses. In July of 1992, the Martins filed a voluntary liquidating bankruptcy. During 1994, a 33-count criminal indictment was issued against Mr. Martin and his sister for diverting insurance premiums to hide them from the NCID regulators. Mr. Martin was found guilty on November 27, 1995, following a 3-month trial. Petitioner attended the trial each day but was not named as a defendant and had no knowledge of the diversion.

As of the time of the trial of this case, petitioner resided in her children's homes, had no assets, and was unable to work due to poor health. At that time, Mr. Martin remained incarcerated, with his prison term to conclude in 2006, and the Martins remain married.

OPINION

Petitioner seeks relief, under section 6015, from income tax deficiency determinations that she now concedes are not in error. Respondent concedes that petitioner is entitled to "separation of liability relief" under section 6015(c) with respect to three Schedule C adjustments as follows: $17,232 for 1986 airplane

rental; $99,838 and $36,422 for insurance sales commission expenses for 1986 and 1987, respectively.

Section 6015 provides, in certain circumstances, for relief from joint liability for tax, interest, penalties, and other amounts arising from a joint Federal income tax return.  See sec. 6015(a), (b), and (c).[1]   Section 6015(a) permits taxpayers to seek relief under section 6015(b) if they filed a joint return and, if eligible, under section 6015(c).  Section 6015(c), in pertinent part, provides for relief for certain joint filers, as follows:

> (c) Procedures to limit liability for taxpayers no longer married or taxpayers legally separated or not living together.
>
> (1) In general. Except as provided in this subsection, if an individual who has made a joint return for any taxable year elects the application of this subsection, the individual's liability for any deficiency which is assessed with respect to the return shall not exceed the portion of such deficiency properly allocable to the individual under subsection (d).
>
> (2) Burden of Proof. Except as provided in subparagraph (A)(ii) or (C) of paragraph (3), each individual who elects the application of this subsection shall have the burden of proof with respect to establishing the portion of any deficiency allocable to such individual.

---

[1] Sec. 6015 was added by sec. 3201(a) of the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105-206, 112 Stat. 734.  Sec. 6015 is effective with respect to any tax liability arising after July 22, 1998, and any tax liability arising on or before July 22, 1998, that is unpaid on that date.

(3) Election.

* * * * *

(C) Election not valid with respect to certain deficiencies.  If the Secretary demonstrates that an individual making an election under this subsection had actual knowledge, at the time such individual signed the return, of any item giving rise to a deficiency (or portion thereof) which is not allocable to such individual under subsection (d), such election shall not apply to such deficiency (or portion) * * *

Therefore, section 6015(c) relieves certain joint-filing taxpayers by making them liable only for those items of which they had actual knowledge, rather than being liable for all items reportable on the joint return.  In effect, this approach is intended, to the extent permitted, to treat certain spouses as though they had filed a separate return.  This is a departure from predecessor section 6013(e) and companion section 6015(b) where the intended goal was to permit relief only if the relief-seeking spouse did not know or had no reason to know of an item.

Accordingly, taxpayers who are either no longer married, separated (for 12 months or more), or not living together (petitioner's circumstance) may elect treatment as though they had separately filed.  Section 6015(c)(3)(C), however, does not permit the election of separate treatment for any item where "the Secretary demonstrates that an individual * * * had actual knowledge, [of the item] at the time such individual signed the return".  Petitioner has elected separate treatment under section 6015(c), and, accordingly, respondent bears the burden of showing

that petitioner had "actual knowledge * * * of any item giving rise to a deficiency (or portion thereof) which is not allocable to [petitioner]".[2]

The concept of actual knowledge under section 6015(c) has been addressed by this Court in Charlton v. Commissioner, 114 T.C. 333, 341-342 (2000), where relief was granted, and Cheshire v. Commisioner, 115 T.C. __, __ (2000) (slip op. at 17-23), where relief was denied.

In Charlton v. Commissioner, supra, a recent application of the innocent spouse rule, we explained that a section 6015(c) election "is not valid if respondent shows that the individual making the election had actual knowledge when signing the return of any 'item' giving rise to a deficiency (or portion thereof) which is not allocable to the electing individual." Id. at 341. In Charlton, the taxpayer seeking relief was aware that the source of income was his wife's business, but he did not compare records provided him by his wife with other business records to determine whether his wife had accounted for all of the income. Although Mr. Charlton had actual knowledge of income from a particular source and knew generally of his spouse's source of income, he had no knowledge that all income from that source had

---

[2] Respondent, has agreed that petitioner is entitled to sec. 6015(c) relief with respect to three items other than the Primera transaction. The only question we consider here is whether petitioner had "actual knowledge" within the meaning of sec. 6015(c).

not been accounted for as reported.  We thus held in <u>Charlton</u> that "respondent has not shown that Charlton had actual knowledge of the item causing the deficiency, and that Charlton qualifies for relief under section 6015(c)."  <u>Id.</u>

A few months later, this Court again had the opportunity to consider the section 6015(c) relief provisions.  In <u>Cheshire v. Commissioner</u>, <u>supra</u>, also an omitted income case, petitioner had actual knowledge of the fact of the omitted income, as well as the amount of income, but submitted that she was entitled to relief because she was unaware of the applicable tax laws. Specifically, petitioner "was aware of the amount, the source, and the date of receipt of the retirement distribution and interest" but did not know the tax consequences of the income. <u>Id.</u> (slip op. at 19).  In that case we held that "knowledge" for purposes of section 6015(c) relief disqualification does not require actual knowledge on the part of the electing spouse as to whether the entry on the return is or is not correct.  See <u>id.</u> Instead, the electing spouse must have "actual knowledge of the disputed item of income * * * as well as the amount thereof, that gave rise to the deficiency".  <u>Id.</u> (slip op. at 23).  Thus, in <u>Cheshire v. Commissioner</u>, <u>supra</u>, we concluded that ignorance of the applicable tax law is no excuse and that respondent had met his burden of proving knowledge of the omitted income.

Cheshire v. Commissioner, supra, established that actual knowledge of the disputed item of income and the amount thereof prevents a taxpayer from claiming innocent spouse relief under section 6015(c). With those principles and Charlton as our backdrop, we must determine whether petitioner is entitled to innocent spouse relief under section 6015(c)(3)(C).

Petitioner contends that respondent's showing of her minimal or superficial knowledge about Mr. Martin's transfer of shares in Primera and of the sale of Primera land is insufficient to meet the statutory threshold necessary to deny her section 6015(c) relief. Respondent argues that petitioner's attendance at the shareholders' meeting 1 year prior to the filing of the return in question and learning that the Primera property was sold to Twentieth Century Life for $22,500,000 constitutes actual knowledge of the item giving rise to the deficiency.

In Charlton v. Commissioner and Cheshire v. Commissioner, supra, the nonelecting spouse received an amount of income from a business or as a lump sum from a distribution of retirement benefits of which the electing spouse was aware. Here, petitioner and her spouse did not receive any cash or property. The "Primera" transaction involved a complex series of steps that resulted in the transfer of stock and the sale of property which was structured to qualify as a nontaxable transaction under section 351 for Federal tax purposes. Without petitioner's

involvement or knowledge, Mr. Martin and certain professionals devised this complex and somewhat devious transaction consisting of a series of steps and involving several entities. The transaction was primarily intended to deceive State insurance regulators into believing that the asset position or picture of Mr. Martin's insurance company was improved. The transaction was further complicated because it was structured for tax purposes to appear that the transfer of property to the corporation(s) was a nontaxable event under section 351. Ultimately, the desired results were not achieved, Mr. Martin was incarcerated due to his fraudulent deceptions, and petitioner was left penniless and bankrupt.

Petitioner knew that Mr. Martin intended to contribute shares in Primera to another corporation, but she had no actual knowledge of the myriad and complex steps or entities involved in the transaction. Petitioner's uncontroverted testimony revealed that she was, at most, superficially aware of only a small portion of the details in these complex transactions. Because petitioner had only a superficial awareness of the transaction, petitioner did not have actual knowledge of the amount of the financial gain that was misreported, nor of the underlying facts that gave rise to the gain. Based on the facts pertaining to the transactions available to petitioner, she would not have known that the stock transfer was not a section 351 transaction or that

the corporate sale of land could have resulted in financial gain or income to her husband.[3]  Like the taxpayer in <u>Charlton v. Commissioner</u>, <u>supra</u>, petitioner possessed only a part of the information, and the information that she did possess was insufficient to supply her with actual knowledge regarding the amount of the financial gain from the transaction, if any.  In sum and in substance, petitioner knew only that Mr. Martin had transferred his stock in Primera and land was sold.  Without knowledge of additional and complex facts, petitioner would not be in a position to actually know the amount of the financial gain from the transaction, if any.

We have difficulty discerning any meaningful differences between the taxpayer in <u>Charlton v. Commissioner</u>, <u>supra</u>, who knew of the income source and did not verify the total amount reportable, and petitioner, who knew that her husband transferred stock and sold land, but had no knowledge of the amount of the financial gain, if any, or of most of the facts that gave rise to that gain.  Unlike the taxpayer in <u>Cheshire v. Commissioner</u>, <u>supra</u>, respondent has not shown that, at the time she signed the return, petitioner had actual knowledge of items underlying the possibility of any financial gain.

---

[3] Neither party disputes that any gain arising from the stock transfer and land sale would have been reported solely by petitioner's husband had petitioner and her husband filed separate tax returns.

We have considered and compared <u>Charlton v. Commissioner</u>, <u>supra</u>, and <u>Cheshire v. Commissioner</u>, <u>supra</u>, to decide whether petitioner is entitled to innocent spouse relief.  We hold that respondent has not shown that petitioner had actual knowledge of the amount of the item giving rise to a deficiency.[4]

Respondent also determined additions to tax for negligence under section 6653(a)(1)(A) and (B) and for delinquency under section 6651(a)(1).  Because of our holding with respect to section 6015(c) relief, petitioner's income tax deficiency, if any, for either tax year would be de minimis.[5]  In particular, respondent agreed to section 6015(c) relief for all of the adjustment items other than the one we have decided in petitioner's favor.  In that regard, respondent relied on petitioner's husband's transactions/adjustments to assert that petitioner was liable as a joint return filer for the negligence addition to tax.  With all of those adjustments either conceded by respondent or decided in petitioner's favor, the predicate for the negligence addition no longer exists.  Accordingly, we hold

---

[4] It is unnecessary to consider petitioner's arguments for relief under other provisions of sec. 6015 because we have decided she is not liable for the portion of any deficiency attributable to the "Primera" transaction.  In that regard, in this proceeding, petitioner sought relief solely from that transaction.

[5] It appears that the remaining adjustments are more mathematical in nature and dependant upon the adjustments that have been conceded or determined.

that petitioner is not liable for the addition to tax for negligence for either taxable year.

With respect to the delinquency addition, petitioner has failed to offer evidence that would relieve her of that obligation, and, to the extent that the Rule 155 computation results in any income tax deficiency due from petitioner, she will be liable for the section 6651(a)(1) delinquency addition to tax.

To account for concessions of the parties and to reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155.</u>